IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:09-CV-205-D

| | | |
|---|---|---|
| LORD CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| S&B TECHNICAL PRODUCTS, INC., | ) | |
| TERRAMIX S.A., and MARK A. WEIH, | ) | |
| | ) | |
| Defendants. | ) | |

This case comes before the court on the second motion (D.E. 346) by defendants S&B

Technical Products, Inc. ("S&B"), Terramix S.A. ("Terramix") and Mark A. Weih ("Weih")

(collectively "defendants") for partial summary judgment on the claims for trademark infringement

and trade dress infringement under the Lanham Act, pursuant to Fed. R. Civ. P. 56. Plaintiff Lord

Corporation ("plaintiff" or "Lord") opposes the motion. The motion has been fully briefed.[1] It was

referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* 28 Feb.

2011 entry following D.E. 452). For the reasons set forth below, it will be recommended that

defendants' motion be allowed.

## BACKGROUND

In this action, commenced on 9 May 2009, plaintiff alleges that Terramix and its affiliate

S&B, working with plaintiff's former employee Weih, misappropriated confidential information and

---

[1] In support of their motion, defendants filed a memorandum (D.E. 347), declarations (D.E. 348, 349), and other exhibits (D.E. 349-1 to -13, 350-1 to -12, 351-1 to -15). Plaintiff filed a memorandum in opposition (D.E. 373) and multiple declarations (D.E. 374, 380, 384, 385, 386, 388, 391) with exhibits (D.E.374-1 to -12, D.E. 375-1 to -6, D.E. 376-1 to -3, D.E. 377-1, D.E. 378-1, D.E. 379-1, D.E. 380-1 to -3, D.E. 381-1, D.E. 382-1, D.E. 383-1 to -11, D.E. 384-1 to -2, D.E. 385-1 to -2, D.E. 386-1, D.E. 388-1 to -5) that apply to this motion and several others filed by defendants. Defendants filed a reply memorandum (D.E. 405) with exhibits (D.E. 405-1 to -4).

proprietary trade secrets relating to plaintiff's CHEMLOK[2] brand of primers and adhesives, and manufactured and distributed a substantially similar primer and adhesive product named Kemibond. (Am. Compl. (D.E. 25), *e.g.*, ¶¶ 3, 17, 29, 37, 38, 40).[3]

Plaintiff alleges that it began marketing its CHEMLOK products[4] in the 1950s. (Am. Compl. ¶ 9). It has possessed a trademark registration in the CHEMLOK mark, as applied to the field of adhesive primers and coatings used to bond rubber to metal, since 1956. (Am. Compl., Ex. A (D.E. 25-2) (Fed. Trademark Registrations Nos. 0647649, 0669147, and 0684271); Dawn Astorino Dec. (D.E. 218) ¶ 4). In its amended complaint, plaintiff alleges that CHEMLOK products are packaged in a can with a solid color bar running across the top of the can with the Lord and CHEMLOK name displayed. (Am. Compl. ¶ 12) (displaying photograph of CHEMLOK label showing top colored band).

While the record developed during discovery confirms this allegation, it also clarifies that the CHEMLOK trade dress (*i.e.*, the shape, color, and design of a product's packaging and containers), as claimed by plaintiff, also includes a narrow colored band at the bottom of the label. (*See* Pl.'s Mem. (D.E. 373) 3 (displaying photograph of CHEMLOK label showing red bands at top and bottom of can); Astorino Dec. ¶ 5 (D.E. 218-1) (identifying example of trade dress for which plaintiff is claiming protection)). In addition, the trade dress was modified in 2006. (Astorino Dec.

---

[2] The court is following the parties' convention in most of their filings of spelling CHEMLOK in all capitals and Kemibond with only an initial capital. For readability, it is eschewing quotation marks around these terms unless expressly referred to as such.

[3] The original complaint (D.E. 1) misidentified S&B (*see* D.E. 20) and the court granted plaintiff leave to amend the complaint to correct the error (D.E. 23). Plaintiff filed an amended complaint on 29 May 2009 (D.E. 24) and then a corrected version of it (D.E. 25) on 1 June 2009.

[4] There is a family of primers and adhesives associated with each CHEMLOK and Kemibond. The court's references to the products associated with each is to their respective families of products, rather than to specific individual products.

2

¶ 12).  Prior to 2006, only the word "CHEMLOK" appeared within the red band at the top of the can, but in that year plaintiff began putting the Lord name inside the red band with the word "CHEMLOK" beneath it.  (*Id.*).  Some products with the pre-2006 trade dress are still used in certain markets.  (*Id.* ¶ 7).  In addition, in the early 1990s until 2002, plaintiff also produced an aqueous line of CHEMLOK adhesives with a label that had green bands at the top and bottom of the cans, rather than the red it normally uses.  (*Id.* ¶ 8).  In total, plaintiff has sold more than a billion dollars worth of products under the CHEMLOK mark.  (*Id.* ¶ 10).  Plaintiff advertises CHEMLOK products in various ways, including in trade publications and at industry shows.  (*Id.* ¶¶ 11, 13).

Defendants began manufacturing Kemibond in 2007.  (Mark Weih Dec. (D.E. 346-5). ¶ 38).  Plaintiff contends that Kemibond's mark and trade dress were intentionally designed to be nearly identical to CHEMLOK's in order to confuse or deceive the consuming public.  (Amend. Compl. ¶¶ 48, 51, 53).  Kemibond is also packaged in a can and has blue or green bands across the top and bottom of the can and the word "Kemibond" within the top band.  (Photos. of Kemibond Labels (D.E. 346-16) 1-2).  Plaintiff's and defendants' products both contain warning labels, chemical contents, and directions for use.  (*See id.*; Photo of post-2006 CHEMLOK Label (D.E. 218-1)).

Plaintiff asserts claims for trade secret misappropriation, unfair and deceptive trade practices, unfair competition, and violation of the Lanham Act, among other claims.  (Amend. Compl., *e.g.*, 1).  The Lanham Act claims are for infringement of the CHEMLOK trademark (*id.*, 3rd Claim, ¶¶ 71-77), in violation of 15 U.S.C. § 1114(1), and infringement of the CHEMLOK trade dress, in violation of 15 U.S.C. § 1125(a) (*id.*, 4th Claim, ¶¶ 78-82).  Defendants answered, denying any wrongdoing, and counterclaimed; plaintiff denies the allegations in the counterclaim.  (*See* D.E. 101, 325, 336).

Defendants initially filed a motion for partial summary judgment on plaintiff's trademark and trade dress infringement claims on 18 June 2010 (D.E. 190). Plaintiff opposed the motion and filed its own motion (D.E. 227) under then Rule 56(f) (now Rule 56(d)) arguing that summary judgment was precluded by the incompleteness of material discovery. The court allowed plaintiff's motion and denied defendants' without prejudice. (*See* Mem. and Rec. (D.E. 345), adopted by court (D.E. 398)). By the instant motion, defendants seek to renew their motion for summary judgment on plaintiff's claims for trademark infringement and trade dress infringement under the Lanham Act, now that discovery is complete.

## DISCUSSION

Defendants seek summary judgment on the merits of both plaintiff's trademark infringement claim and trade dress infringement claim. They also request summary judgment on these claims on the grounds that the Lanham Act, upon which these claims are based, does not apply to the events in issue.

The court begins its analysis of the motion with a review of the summary judgment standard. It then turns to the merits of each infringement claim under the Lanham Act and related case law, applying the summary judgment standard. This merits-based analysis assumes without deciding that the Lanham Act applies. The court concludes with the issue of applicability of the Lanham Act.[5]

---

[5] Defendants included in their memorandum (D.E. 347 at 3-6) a list of purportedly undiputed material facts based on their Rule 30(b)(6) deposition of plaintiff's designee, Dawn Astorino, to which plaintiff responded in its memorandum (D.E. 373 at 7-9). The court addresses alleged facts included in the list in the course of its analysis, rather than in a separate section. The list and the response do not reveal any dispute as to any material fact.

4

# I.      STANDARD OF REVIEW FOR SUMMARY JUDGMENT

It is well established that a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)[6]; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In analyzing whether there is a genuine issue of material fact, all facts and inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996).

The burden is on the moving party to establish the absence of genuine issues of material fact and "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323; *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991) ("[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate."). If the movant meets its burden, then the nonmoving party must provide the court with specific facts demonstrating a genuine issue for trial in order to survive summary judgment. *Celotex*, 477 U.S. at 323. The nonmoving party is not permitted to rest on conclusory allegations or denials, and a "mere scintilla of evidence" will not be considered sufficient to defeat a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

---

[6] Although Rule 56 was amended in December of 2010, the standard for summary judgment was not changed by this amendment. *Peters-Martin v. Navistar Int'l Transp. Corp.*, 410 Fed. Appx. 612, 619 n.5 (4th Cir. 2011) ("Recent amendments to the Federal Rules of Civil Procedure, which became effective on December 1, 2010, moved the relevant language from section (c)(2) of Rule 56 to its present location in section (a). However, the advisory committee's note indicates that, despite these amendments, '[t]he standard for granting summary judgment remains unchanged.'") (citing Fed. R. Civ. P. 56 advisory committee's note).

Rule 56 permits the court to grant summary judgment "with respect to all claims in an action or only some claims in a multiple claim action." *Evergreen Int'l, S.A. v. Marinex Const. Co., Inc.*, 477 F. Supp. 2d 697, 699 (D.S.C. 2007). A motion for partial summary judgment "utilizes the same standards required for consideration of a full motion for summary judgment." *Pettengill v. United States*, 867 F. Supp. 380, 381 (E.D. Va. 1994). "In a complex fact-intensive case . . . , a court has discretion to deny a partial summary judgment, even if such is justified, in order to proceed more efficiently and more expeditiously with a definitive resolution." *Ryste & Ricas, Inc. v. United States*, 50 Fed. Cl. 85, 90 (2001). "In assessing a summary judgment motion, a court is entitled to consider only the evidence that would be admissible at trial." *Kennedy v. Joy Tech., Inc.*, 269 Fed. Appx. 302, 308 (4th Cir. 2008). Summary judgment may be appropriate in cases involving Lanham Act claims. *See George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 392 (4th Cir. 2009) (affirming district court allowance of defendants' motion for summary judgment on trademark claims); *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 170 (4th Cir. 2006) ("Summary judgment may be granted in a trademark dispute when the material, undisputed facts disclose a likelihood of confusion.").

## II.    TRADEMARK INFRINGEMENT CLAIM

### A.    Likelihood of Confusion Test

The term "trademark" "includes any word, name, symbol, or device, or any combination thereof . . . [used] to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. In order to sustain a trademark infringement action under the Lanham Act, a plaintiff must prove "that it has a valid, protectable trademark and that the defendant is infringing its mark by creating confusion,

6

or a likelihood thereof, by causing mistake, or by deceiving as to the attributes of its mark." *Am. Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 819 (4th Cir. 2001); *see also* 15 U.S.C. § 1114(1). Here, defendants do not dispute that plaintiff possesses a valid and protectable mark for its CHEMLOK products. Instead, the issue before the court is whether there is a likelihood of confusion between the CHEMLOK and Kemibond marks. (*See* Defs.' Mem. (D.E. 347) 7 ("While there is no dispute that CHEMLOK is a registered United States trademark, there should also be no genuine dispute that the differences between the marks preclude any likelihood of confusion.")).

To assess a likelihood of confusion between two products, a court may consider nine factors: "'(1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.'" *Georgia Pacific Consumer Prods., LP v. Von Drehle Corp.*, 618 F.3d 441, 454 (4th Cir. 2010) (quoting *George*, 575 F.3d at 393). The Fourth Circuit makes clear that all nine factors are not of equal importance and has held that the seventh factor, actual confusion, is "'often paramount' in the likelihood of confusion analysis." *George*, 575 F.3d at 393 (quoting *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001)); *accord Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 937 (4th Cir. 1995) (noting that the actual confusion factor is "entitled to substantial weight as it provides the most compelling evidence of likelihood of confusion"); *Virginia Polytechnic Inst. v. Hokie Real Estate*, No. 7:10CV466, 2011 WL 926862, at *11 (W.D. Va. 15 Mar. 2011) ("Moreover, while evidence of actual confusion is not required, it is the 'most important

factor.'") (citing *George*, 575 F.3d at 393)); *Field of Screams v. Olney Boys and Girls Comm. Sports Assoc.*, No. DKC 10-0327, 2011 WL 890501, at *7 (D. Md. 14 Mar. 2011) ("Actual confusion, however, is given special weight . . . ."). The first factor, strength or distinctiveness of the mark, can also have particular importance. *See Korman*, 470 F.3d at 171 ("[T]he first factor—the strength or distinctiveness of the plaintiff's mark—is important to an assessment of the confusion issue . . . ."). The court will address each of the nine factors separately.

### B. Factor-by-Factor Analysis

#### 1. Strength of the Mark

"Generally, the stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark." *George*, 575 Fed. 3d at 393. An assessment of a mark's strength evaluates the degree to which a consumer would associate the mark with a unique source and includes both the mark's conceptual strength and commercial strength. *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006). A mark's conceptual strength depends upon its peculiarity in the market and its commercial strength upon whether present or prospective customers would understand it to refer to a particular entity. *Id.*; *Coryn Group II, LLC v. O.C. Seacrets,Inc.*, No. WDQ-08-2764, 2011 WL 862729, at *10 (D. Md. 10 Mar. 2011) ("In assessing overall strength, two considerations apply: (1) a mark's conceptual strength, meaning the relationship between the mark and the goods or services it is used for, and (2) its commercial strength, meaning the degree to which the mark is known by the consuming public.") (citing *World Gym Licensing Ltd. v. Fitness World, Inc.*, 47 F. Supp. 2d 614, 621-22 (D. Md. 1999)).

8

## a.    Conceptual Strength

Conceptual strength is divided into four categories of distinctiveness.  Ranging from least to most distinctive, these categories are:  (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful.  *George*, 575 F.3d at 394 (citing *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir. 1984)).  The more distinctive a mark is, the stronger it is and the broader protection it is generally afforded.  *Field of Screams*, 2011 WL 890501, at *4 ("A more distinctive mark enjoys more protection under trademark law."); *Coryn Group*, 2011 WL 862729, at *10 ("The stronger the senior mark, the greater the likelihood that a junior user's use will confuse the public.") (citing *Synergistic Int'l*, 470 F.3d at 171)).

A generic mark[7] is not distinctive:  it "neither signifies the source of goods nor distinguishes the particular product from other products on the market."  *George*, 575 F.3d at 394.  A generic mark is therefore never entitled to trademark protection.  *Id.*

A descriptive[8] mark defines the product's characteristics by its terms and is therefore not inherently distinctive.  *Id.*  Therefore, a descriptive mark will not warrant trademark protection unless a showing of secondary meaning can be made.  *Id.*  A mark has acquired secondary meaning when it has become sufficiently distinctive to establish a mental association in buyers' minds between the mark and the source of the product.  *Retail Servs. v. Freebies Publishing,*, 364 F.3d 535, 539 (4th Cir. 2004); *accord Perini Corp. v. Perini Const.*, 915 F.2d 121,125 (4th Cir. 1990) ("Secondary meaning is the consuming public's understanding that the mark, when used in context,

---

[7] The Fourth Circuit has identified bleach, copiers, cigarettes, and cars as examples of generic marks.  *George*, 575 F.3d 394.

[8] Examples of descriptive marks include "After Tan post-tanning lotion" and "5 minute glue."  *George*, 575 F.3d at 394.

9

refers, not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify.").

A suggestive[9] mark does not describe the features of the product, but rather merely suggests them, and therefore, such marks are considered inherently distinctive. *George*, 575 F.3d at 394. Thus, unlike with descriptive marks, which directly impart information, "the exercise of some imagination is required to associate a suggestive mark with the product." *Id.*; *Pizzeria Uno*, 747 F.2d at 1528 ("[I]f the mark imparts information directly, it is descriptive, but if it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive.").

Lastly, fanciful or arbitrary marks[10] involve made-up words or words with no connection to the product itself that were created for the sole purpose of serving as the product's trademark. *George*, 575 F.3d at 394. They are accorded the highest level of protection.

Here, defendants characterize plaintiff's mark as descriptive or at best suggestive (Defs.' Mem. 8). Plaintiff contends that the mark is at least suggestive and possibly even arbitrary in nature (Pl's. Mem. (D.E. 373) 13).

The court finds that plaintiff's mark falls in the suggestive category. The term "CHEMLOK" defines the product itself in a way that requires some exercise of the imagination in that it merely suggests the features of the product—namely, that it is a chemical adhesive. The fact that the United States Patent and Trademark Office ("USPTO") did not require evidence of secondary meaning supports the finding that CHEMLOK is suggestive, rather than descriptive as defendants advocate.

---

[9] Examples of suggestive marks include Coppertone, Orange Crush, and Playboy. *George*, 575 F.3d at 394.

[10] Examples of fanciful marks include Clorox, Kodak, Polaroid, and Exxon, and examples of arbitrary marks include Camel cigarettes and Apple computers. *Sara Lee*, 81 F.3d at 464.

10

"If the USPTO believes a mark is descriptive, the registrant must provide evidence of secondary meaning before the USPTO will grant registration." *George*, 575 F.3d at 395. The USPTO's determination is prima facie evidence of whether a mark is descriptive or suggestive. *Id.*

Accordingly, as a suggestive mark, the CHEMLOK mark is entitled to less protection than an arbitrary or fanciful mark would warrant. Indeed, "without a showing of commercial strength, suggestive marks are 'presumptively weak' and are 'entitled to a restricted range of protection.'" *H. Jay Spiegel & Assocs., P.C. v. Spiegel*, 652 F. Supp. 2d 639, 649-50 (E.D. Va. 2009) (internal citations omitted), *aff'd*, 400 Fed. Appx. 757 (4th Cir. 2010).

### b. Commercial Strength

The court turns now to consider the mark's commercial strength. "[C]ommercial strength . . . [is] a concept similar to the 'secondary meaning' inquiry considered in evaluating a mark's validity." *George*, 575 F.3d at 395 (quoting *CareFirst*, 434 F.3d at 269 n.3). Therefore, in considering commercial strength, the Fourth Circuit instructs that the same factors for determining secondary meaning are to be used. *Id.* These factors are: "(1) the plaintiff's advertising expenditures; (2) consumer studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark." *Id.* (quoting *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 125 (4th Cir. 1990)). The court addresses each factor below.

First, as to advertising, plaintiff has demonstrated that it has substantial advertising expenditures. It advertises in trade publications such as *Rubber & Plastics News* and *Rubber World Magazine*. (Astorino Dec. ¶ 11). It has developed a number of different advertising campaigns and runs advertisements from these campaigns in leading trade publications. (*Id.* ¶ 12). Plaintiff has

11

provided several examples of its advertisements, though none of these examples depict its trade dress. (*Id.* ¶ 12 & Ex. 5 (D.E. 218-5)). Plaintiff also promotes its products at industry trade shows, such as the American Chemical Society's Rubber Expo, the India Rubber Expo, and another similar trade show in Brazil. (*Id.* ¶¶ 12, 13). In addition, plaintiff holds private events and receptions for its customers to promote its products. (*Id.* ¶ 13).

Second, as to consumer studies, plaintiff contends that "consumer research shows that nearly 100% of respondents think first of 'CHEMLOK' when thinking of rubber-to-substrate primers and adhesives." (*Id.* ¶ 14). This statement has little meaning, however, because, among other reasons, the specific type of research done and the population surveyed are not identified. Plaintiff did not submit the research to which it refers. Nor did plaintiff submit any other consumer studies linking the CHEMLOK mark to plaintiff, notwithstanding its representations that such studies exist. (*See* Pl.'s Mem. (D.E. 373) 8-9, ¶¶ 2, 7, 8). This gap in evidence is significant because such studies are "'generally thought to be the most direct and persuasive way of establishing secondary meaning'" and thereby commercial strength. *George*, 575 F.3d at 396 (quoting *U.S. Search, LLC v. U.S. Search.com, Inc.*, 300 F.3d 517, 526 n.13 (4th Cir. 2002)).

Third, as to sales success, plaintiff has demonstrated it. It has sold more than a billion dollars worth of product. (Astorino Dec. ¶ 10). This includes more than five hundred million dollars worth of primers and adhesives in the pre-2006 trade dress and more than five million dollars of CHEMLOK aqueous products containing the green color bands. (*Id.* ¶ 9).

Fourth, as to unsolicited media coverage, plaintiff says that "CHEMLOK products have been the subject of innumerable trade articles, many of which depict a visual representation of the product." (*Id.* ¶ 11). But no examples of such articles have been provided to the court.

12

Fifth, as to plagiarism, plaintiff has not presented evidence of any attempts to plagiarize the mark. Sixth and last, as to length of exclusive use, the record shows plaintiff has used this mark exclusively for over 50 years. (Astorino Dec. ¶ 4).

As can be seen, various factors weigh in favor of plaintiff on the issue of commercial strength, such as advertising expenditures, sales success, and length of exclusive use of the mark. But the critical factor of consumer studies does not as a result of plaintiff's failure to submit meaningful evidence of any such studies, including any copies of the studies themselves. The court finds that the commercial strength of the CHEMLOK mark is weak.

Moreover, as defendants note, there is a large number of third-party applications containing the name "Chem" or "Lok" in their title. (USTPO Search Results (D.E. 346-4)). Whether this fact is deemed to bear on conceptual or commercial strength, it weighs against the strength of the mark. *See Petro Stopping Centers v. James River Petroleum*, 130 F.3d 88, 93 (4th Cir. 1997) ("The frequency with which a term is used in other trademark registrations is indeed relevant to the distinctiveness inquiry under the first likelihood of confusion factor. This is especially true when the number of third-party registrations is great."); *Coryn Group*, 2011 WL 862729, at * 11 ("If a mark is frequently used in the same field by different companies, the third-party use 'prove[s] that some segment of the [ ] marks which both contesting parties use has a normally understood and well recognized descriptive or suggestive meaning, leading to the conclusion that [it] is relatively weak.'") (quoting *Petro Stopping Ctrs.*, 130 F.3d at 94)). A similar consideration also undermining CHEMLOK's strength is plaintiff's prior agreement to and acquiescence in use of the mark "ChemBond" by a third party manufacturer. (*See* 9 Jan. 1981 Letter (D.E. 346-3) 2).

13

The court concludes that overall the CHEMLOK mark should be deemed weak for purposes of the strength of the mark analysis. *Petro Stopping*, 130 F.3d at 93 ("Even a mark held to be suggestive may be found weak under the first likelihood of confusion factor.").

### 2. Similarity of the Two Marks

To assess the similarity of the marks for purposes of this factor, the court must examine whether there is any similarity in the sight, sound, or meaning of the marks that would result in confusion. *Pizzeria Uno,* 747 F.2d at 1534-35.

As to sight, there are differences that readily distinguish CHEMLOK from Kemibond. The "Ch" at the beginning of CHEMLOK contrasts with the "K" at the beginning of Kemibond, even though both are followed by "em." In addition, the last syllables in both are entirely different— "lok" as opposed to "bond." To be sure, there are similarities in the trade dress associated with each mark, as discussed in a section below. But from a visual standpoint, CHEMLOK is not likely to be confused with Kemibond.

In sound, the relationship between the two marks is closer. The first syllable of both is pronounced the same, "chem" as in "chemical," even though the syllables are spelled differently. But the pronunciation of the last syllable of each is entirely different—"lock" versus "bond." Moreover, while CHEMLOK has just two syllables, Kemibond has three. The extra syllable is the "i," pronounced like a long "e." Someone hearing CHEMLOK is not likely to believe he is hearing Kemibond.

The strongest similarity between the two marks is in meaning. CHEMLOK, of course, suggests a chemical lock or adhesive. Kemibond has the same connotation.

Plaintiff argues that the similarities between the marks predominate, but the court finds that the differences predominate. While the meaning conveyed by the marks is the same, the differences in the visual appearance and sound of the two marks makes confusion of the two unlikely. This factor therefore weighs against plaintiff.

### 3. Similarity of the Products

Defendants concede that this factor weighs in plaintiff's favor. While the goods at issue need not be identical or in direct competition with each other in order to satisfy this factor, *George*, 575 F.3d at 397, in this instance, the products are essentially the same. This similarity factor therefore clearly favors plaintiff.

### 4. Similarity of Facilities

This factor concerns the similarity of the trade channels in which the products are marketed and the overlap between the markets in which the products are sold. *Louis Vuitton Malletier S.A. v. Haute Diggity Dog*, LLC, 464 F. Supp. 2d 495, 501 (E.D. Va. 2006), *aff'd*, 507 F.3d 252 (4th Cir. 2007). As one court has put it, "[t]he likelihood of confusion may also be increased if both goods are sold in the same channels of trade. The relevant inquiry under this factor is whether the goods are sold to the same class of consumers in the same context." *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 405 F. Supp. 2d 680, 696 (E.D.Va. 2005), *aff'd*, 227 Fed. Appx. 239 (4th Cir. 2007) (internal citations omitted).

While there are some similarities between the parties with respect to this factor, differences predominate. For example, both sell or have sold to customers in Vietnam and India. (*See* Atul Vijaykumar Patankar Dec. (D.E. 221) ¶ 4; Julio Perez Dec. (D.E. 222) ¶ 4). This, though, is defendants' entire market (outside of sales to the affiliated defendant S&B). (Patankar Dec. ¶¶ 7,

8). In particular, defendants do not sell to any customers within the United States. (*See* Mark Weih Dec. (D.E. 346-5) ¶¶ 4, 7). In contrast, plaintiff does sell in the United States and broadly throughout the rest of the world, including Latin America, Europe, Asia, and Australia. (*See* Perez Dec. ¶ 4; Karen Sy-Laughtner Dec. (D.E. 224) ¶ 4). Their market includes Vietnam and India, but, as can be seen, it is only a small portion of it. Thus, while there is overlap in the respective geographical markets served by plaintiff and defendants, they are as a whole vastly different.

In addition, the respective parties employ distributors to market their products. (Sy-Laughtner Dec. ¶ 3; Perez Dec. ¶ 5; Weih Dec. (D.E. 346-5) ¶ 4). But whereas defendants appear to rely on distributors exclusively (Weih Dec. ¶ 4), plaintiff also uses direct sales. The direct sales are to its larger global customers; it uses distributors for other customers**.** (Perez Dec. ¶ 3). Therefore, viewed as a whole, the means of selling are different.

There is a similar disparity in the size of the businesses to which the parties sell. Defendants sell to only small enterprises. (Weih Dec. ¶ 4). Plaintiff sells to small businesses, too. (Perez Dec. ¶ 5). But it also sells to large and intermediate-size companies. (*Id.* ¶ 3). Yet again there is overlap between the parties amidst overall dissimilarity.

Plaintiff argues that there would be more similarities between the parties' trade channels and markets but for a shortage of one of Kemibond's primary ingredients manufactured by a third-party. The court declines plaintiff's invitation to speculate about either side's trade channels if certain market forces at play were to change and will limit itself to the record before it. Accordingly, the court cannot say that the parties' respective products are sold "to the same class of consumers in the same context." *Renaissance Greeting Cards, Inc.*, 405 F. Supp. 2d at 696. Therefore, the facilities factor weighs against plaintiff.

### 5. Similarity of Advertising

This factor focuses on the "possibility that a consumer could see or hear advertisements for both . . . [businesses], and could think them related." *Pizzeria Uno*, 747 F.2d at 1534. Relevant considerations include "the media used, the geographic areas in which the advertising occurs, the appearance of the advertisements, and the content of the advertisements." *Scurmont LLC v. Firehouse Restaurant Group, Inc.*, No. 4:09-cv-00618, 2011 WL 2670575, at *18 (D.S.C. 8 Jul. 2011).

As noted previously, plaintiff advertises its CHEMLOK products on a wide scale in trade publications and trade shows. In contrast, defendants have done very little advertising, and none in print media, on television, on the internet, or in other commercial outlets. (*See* Weih Dec. ¶ 4). While plaintiff argues that defendants do not need to advertise in paid media because they merely ride on plaintiff's coattails and established reputation, this argument has not been supported with any concrete evidence. Accordingly, this factor also weighs against plaintiff.

### 6. Defendants' Intent

On this factor, plaintiff relies on circumstantial evidence of defendants' intent. Such evidence includes the fact that the creation of Kemibond was a secret between Corbett, Sr. and Weih. (*See* Brad Corbett, Jr. Dep. (D.E. 219-1) 180:18-22). But it is appropriate for a business to keep secret, or attempt to keep secret, its competitive business plans and other competitive information. Plaintiff itself bases much of this lawsuit on alleged violation of its claims to secrecy for some of its competitive information. Accordingly, the court does not find the secretive nature of Kemibond's creation to be indicative of an intent to deceive, as plaintiff urges.

17

Plaintiff also contends that defendants' choice of name and trade dress for their product shows intent because it purportedly tends to reinforce the association of defendants' product with plaintiff's. It further maintains that defendants copied its Technical Data Sheets in an attempt to pass off their product off as plaintiff's, particularly in dealings with small, less sophisticated, and non-English speaking customers. (Perez Dec. ¶ 4). Plaintiff's evidence of intent is speculative and the inference of intent it urges the court to draw is too great. *See George*, 575 F.3d at 397 (finding this factor in defendants' favor where plaintiff "has presented no meaningful evidence that [defendant] wished to capitalize on [plaintiff's] trademark"). Accordingly, this factor also weighs against plaintiff.

### 7. Actual Confusion

As noted, proof of actual confusion is the most critical factor in the court's analysis. Assessment of actual confusion "'asks whether there has been actual confusion, that is, reported instances of individuals who have actually become confused about the source of the services because of the similarities between the parties' trademarks.'" *Coryn Group*, 2011 WL 862729, at * 3 (quoting *Popular Bank v. Banco Popular*, 9 F. Supp. 2d 1347, 1360 (S.D. Fla. 1998)). Actual confusion may be proved by either anecdotal or survey evidence. *George*, 575 F.3d at 398. "'Evidence of only a small number of instances of actual confusion may be dismissed as *de minimis*.'" *Vantage, Inc. v. Vantage Travel Serv.*, No. 6:08-2765, 2010 WL 1427965, at *5 (D.S.C. 8 Apr. 2010) (quoting *George*, 575 F.3d at 398).

Here, plaintiff has presented no proof of actual confusion. Plaintiff attempts to explain away this lack of evidence by the fact that defendants have suspended sales of Kemibond. It also reminds the court that such evidence is not necessarily required in order to prevail on a trademark claim. But

18

the absence of evidence of actual confusion is a serious deficiency. It is particularly surprising because a common theme of plaintiff's arguments on the other factors is that defendants have been targeting CHEMLOK's unsophisticated and non-English speaking customers. Were this to be true, it would follow that at least some evidence of actual confusion exists. The fact that such evidence has not been produced dictates that this critical factor weigh substantially against plaintiff. *Petro Stopping*, 130 F.3d at 95 ("At worst, the company's failure to uncover more than a few instances of actual confusion creates a presumption against likelihood of confusion in the future."); *Virginia Polytechnic*, 2011 WL 926862, at *13 ("While evidence of actual confusion is not required to prevail under the Lanham Act, the absence of such evidence clearly favors the defendant.").

### 8. Quality of Product

This factor assesses the quality of the products manufactured by the respective parties. Typically, this factor is most relevant in instances where the defendant is alleged to have produced a cheaper copycat product or knockoff of plaintiff's product. *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 (4th Cir. 1996) ("If a defendant markets a product under a mark similar to that affixed by a competitor to a commodity of like nature but superior manufacture, that the defendant's product is markedly inferior is likely to be highly probative of its reliance on the similarity of the two marks to generate undeserved sales."). The evidence presented suggests that the two products are comparable. Aside from criticizing Kemibond's packaging, plaintiff has not come forward with evidence that Kemibond itself is of questionable quality or clearly inferior to its product. Accordingly, this factor is not relevant for purposes of the likelihood of confusion analysis. *See George*, 575 F.3d at 399.

19

### 9. Sophistication of Customers

The ninth factor, sophistication of the consuming public, is relevant only when "the relevant market is not the public at-large." *Sara Lee*, 81 F.3d at 467. The sophistication and expertise of the normal purchaser of the product may preclude the potential for likelihood of confusion. *Perini Corp.*, 915 F.2d at 127 (citing *Oreck Corp. v. U.S. Floor Systems, Inc.*, 803 F.2d 166, 173-74 (5th Cir. 1986) (reversing finding of infringement in part because purchasers, who buy goods for institutional purposes at a high price, are virtually certain to be informed buyers)).

Here, the consumers of both products are not the public at large, but rather entities that perform rubber to metal bonding. Indeed, both CHEMLOK and Kemibond products are not sold to the public at retail stores, but to commercial customers by distributors or, in the case of plaintiff, also by the manufacturer. While plaintiff argues that buyers of the parties' products in Asian markets are less sophisticated than American consumers, these consumers still cannot be considered members of the general public. The chemical adhesives at issue here are unusual enough to necessarily demand a user more sophisticated than the public at large. Thus, the sophistication of the purchasers in question reduces the likelihood of confusion, and this factor weighs against plaintiff. *Virginia Polytechnic*, 2011 WL 926862, at *13 ("However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the service at issue, a higher standard is proper. Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases. When services are sold to such a buyer, other things being equal, there is less likelihood of confusion.") (quoting *Daddy's Junk Music Stores v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 286 (6th Cir. 1997)).

## C. Conclusion on Trademark Infringement Claim

Application of the nine factors set out in *George* shows that the CHEMLOK mark is weak, the only similarity it shares with the Kemibond mark is the similarity of the respective products, and there is no meaningful evidence of intent to infringe or, perhaps most significantly, actual confusion. There is no genuine dispute as to any material fact with respect to any of the factors.[11] The record thus establishes as a matter of law that there is no likelihood of confusion of the two marks and summary judgment in favor of defendants is warranted on plaintiff's trademark infringement claim, assuming the Lanham Act applies. Indeed, plaintiff's claim comes within the scope of the *George* court's observation that "we are aware of no case where a court has allowed a trademark infringement action to proceed beyond summary judgment where two weak marks were dissimilar, there was no showing of a predatory intent, and the evidence of actual confusion was *de minimis*." *George*, 575 F.3d at 400.

## III. TRADE DRESS INFRINGEMENT CLAIM

### A. Overview of CHEMLOK and Kemibond Trade Dress

As indicated, plaintiff contends that the trade dress defendants use on their Kemibond products infringes the trade dress plaintiff uses on its CHEMLOK products. Again as noted, CHEMLOK's trade dress since 2006 consists, in general terms, of a wide colored band at the top of the label in which the name "LORD" appears. (Astorino Dec.¶ 12 (D.E. 218-1) (photo of CHEMLOK label; Pl.'s Mem. 3 (displaying photo. of CHEMLOK label)). Centered under that is the word "CHEMLOK" followed to the right by the product number. Information in a much smaller

---

[11] Even if a genuine dispute as to a material fact did exist as to a particular factor, that dispute would not necessarily be material with respect to the infringement claim as whole given the multiplicity of factors involved and their varying significance.

font is centered under that. There is a much narrower colored band at the bottom of the label. Instructions on use, safety warnings, and other such information appears elsewhere.

The Kemibond trade dress, in general terms, consists of a broad band at the top in which the name "Kemibond" appears. (Photos. of Kemibond Labels (D.E. 346-16) 1-2). Centered under that is the identification of the particular product involved and then information in much smaller font. There is a colored band at the bottom. Other information in a small font size appears elsewhere on the label.

### B. Applicable Legal Standard

"The trade dress of a product consists of its total image and overall appearance, including its size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd.,* 187 F.3d 363, 368 (4th Cir. 1999) (internal quotation marks omitted) (quoting in part *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 764 n.1 (1992)); *see also Campbell Sales Group, Inc. v. Gramercy Park Design, LLC*, No. 1:10CV55, 2010 WL 3945350, at *3 (M.D.N.C. 6 Oct. 2010) (same). "To prove a case of trade dress infringement, a party must demonstrate that (1) its trade dress is primarily non-functional; (2) the alleged infringement creates a likelihood of confusion; and, (3) the trade dress either (a) is inherently distinctive, or (b) has acquired a secondary meaning." *Ashley Furniture,* 187 F.3d at 368; *see also* 15 U.S.C. § 1125(a). The same likelihood of confusion factors used for trademark infringement claims are applied in analyzing the second, likelihood of confusion element of trade dress infringement claims. *See Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 269 (4th Cir. 2007) (citing *Tools USA and Equip. Co. v. Champ Frame Straightening Equip. Inc.*, 87 F.3d 654, 661 (4th Cir. 1996)). The court will address these elements in turn.

C.      **Element-by-Element Analysis**

1.      **Functionality of the Trade Dress**

Product features that are deemed functional are not, standing alone, entitled to protection as trade dress. 15 U.S.C. §§ 1052(e)(5) and (f), 1091(c), 1064(3), and 1115(b). "A product feature is functional if it is essential to the use or purpose of the article or it affects the cost or quality of the article. In other words, a feature is functional if exclusive use of the feature would put competitors at a significant nonreputation-related disadvantage." *Tools USA*, 87 F.3d at 657 (internal quotation marks and citations omitted). This principle reflects the policy behind the non-functionality requirement: to "prevent[] trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Id.* at 658 (internal quotation marks omitted).

The presence of functional features in a trade dress does not, however, by itself render the trade dress functional. "[T]he critical functionality inquiry is not whether each individual component of the trade dress is functional, but rather whether the trade dress as a whole is functional." *Id.* Thus, if a party combines or configures functional elements in a particular arbitrary manner, that combination may be deemed non-functional. *Leviton Manuf. Co. v. Univ. Security Instr., Inc.*, 409 F. Supp. 2d 643, 650 (D. Md. 2006). But "a design is legally functional, and thus unprotectable, if it is one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the [trade dress] protection." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 775 (1992).

Plaintiff contends that to the extent its trade dress includes functional elements, the number of options for their arrangement is not so limited as to preclude protection of the design it uses. In

23

support, it cites to the trade dress of two products (Megum and Thixon) manufactured by another producer, Rohm and Haas, that it depicts as significantly differently from its own. (Pl.'s Mem. 22 (referring to Weih Dec. ¶ 11 & Ex. 2)).[12] Plaintiff further argues that its design is sufficiently arbitrary to merit trade dress protection.

The court believes it indisputable that plaintiff's trade dress contains numerous functional features. They include legally required warnings, information on contents, directions for use, and batch/lot numbers. (Dawn Astorino 30(b)(6) Dep. (D.E. 346-18) 45:10-50:16) (testifying that this information falls under the authority of plaintiff's regulatory department and not marketing).

Given the substantial amount of information that must be included on labels for the types of products at issue, the number of options in trade dress design is constrained. Indeed, plaintiff has cited only two alleged variations. Irrespective of whether the number is so limited as to preclude non-functional trade dress for such products, the court finds that the alternative selected by plaintiff is not so arbitrary as to render it non-functional. Indeed, taken as a whole, the CHEMLOK trade dress resembles that of the two products it cites. As further evidence of its functionality, the CHEMLOK trade dress also resembles the trade dress of other products, such as a paint, where there is a similar need to provide warnings, instructions, and like information.

Given the predominance of functional features in the CHEMLOK trade dress, the court finds that to accord it protection as non-functional would hinder competition. There is no genuine dispute as to any material fact with respect to this issue. The court accordingly concludes as a matter of law

---

[12] These products were first mentioned in defendants' memorandum. (*See* Defs.' Mem. (D.E. 347) 22).

that plaintiff's trade dress taken as a whole is functional and thus not protectable. The first element of the trade dress infringement claim is therefore not satisfied.

### 2. Likelihood of Confusion

As noted, on this element, the court considers the same nine factors used to determine likelihood of confusion on a trademark infringement claim. With respect to most of these factors, the analysis for purposes of the trade dress infringement claim is the same as that for the trademark infringement claim, namely, the similarity of the goods; the similarity of the facilities used; the similarity of advertising; defendants' intent; the quality of defendants' product; and the sophistication of the consuming public. As discussed above, each of these factors weighs against plaintiff except for the similarity of goods factor, which weighs in favor of plaintiff, and the quality of goods factor, which is not relevant. The court turns now to the remaining three factors: the strength or distinctiveness of plaintiff's trade dress as actually used in the marketplace, the similarity to consumers of the trade dress of the respective products, and actual confusion between the products' trade dress.

With respect to the strength factor, in terms of conceptual strength, the trade dress is no more suggestive than the CHEMLOK mark itself and, indeed, is arguably less so because of the functional information included in the trade dress. As to commercial strength, the same limitations on the commercial strength of the CHEMLOK mark apply to the associated trade dress. Moreover, plaintiff itself has not been consistent with its trade dress, varying colors and other elements of the trade dress and even using different versions simultaneously. This inconsistency in the use of the same trade dress undermines the notion that there is a distinctive trade dress consumers associate with plaintiff. The court concludes that the strength or distinctiveness of the CHEMLOK trade dress is weak.

25

As to the similarity between the current CHEMLOK and Kemibond trade dress, while the overall appearance of the trade dress is similar, there are differences that distinguish the two. For example, the products contain different color bands and the bottom band on plaintiff's is thinner than defendants'. In addition, plaintiff's trade dress has the company name within the top band and the product name underneath, whereas defendants' has the product name within the top band and the company name and address in a much smaller font within the bottom band. But it is the difference in the marks themselves as a constituent element of each trade dress that most apparently distinguishes the two. The differences in the CHEMLOK and Kemibond trade dress, while limited given their overall functional nature, make it unlikely that a consumer would confuse one for the other. This conclusion finds support in plaintiff's position that the differences in the Rohm and Haas products are sufficient to make those products noninfringing, because the differences between the CHEMLOK and Kemibond trade dress are comparable. The court reaches the same conclusion with respect to the similarity of the pre-2006 CHEMLOK trade dress and the Kemibond trade dress. This factor therefore weighs against plaintiff.

On the factor of actual confusion, again, plaintiff has not identified any evidence of consumer confusion between the two products. *Z-Man Fishing Prods., Inc. v. Renosky*, No. 2:11CV428RMG, 2011 WL 1930636, at *9 (D.S.C. 17 May 2011) (finding a lack of evidence indicating customer confusion resulting from similarity of trade dress). This factor, too, therefore weighs against plaintiff. With respect to this and the strength of trade dress and similarity of dress factors, the court notes as well that there is no genuine dispute as to any material fact.

The court concludes that as a matter of law the record establishes that there is no likelihood of confusion between the CHEMLOK trade dress and Kemibond trade dress. Accordingly, the likelihood of confusion element of plaintiff's trade dress infringement claim is not satisfied.

### 3. Inherent Distinctiveness or Secondary Meaning

As indicated, to satisfy the third and final element of its trade dress infringement claim, plaintiff's trade dress must be either inherently distinctive or have secondary meaning. *Ashley Furniture,* 187 F.3d at 368.

Trade dress that is considered inherently distinctive must be "unique or unusual in the particular field at issue" and "differ from its predecessors in more than [a] trivial way." *Id.* at 374 ("Thus if an overall product design differs only slightly from the designs of preexisting competing products, it does not qualify for protection as inherently distinctive trade dress."). As noted, "secondary meaning" suggests that the dress is sufficiently distinctive so as to identify the source of the product rather than the product itself in the minds of the public. *Retail Servs.*, 364 F.3d at 539; *Campbell Sales Group, Inc.*, 2010 WL 3945350, at *4. In the Fourth Circuit, there is a presumption of secondary meaning where there is evidence of intentional, direct copying of plaintiff's trade dress by defendant. *Id.* at *5.

Here, there is no meaningful evidence before the court that establishes that plaintiff's trade dress is so unique or unusual as compared to other products in this field to render it inherently distinctive. As discussed, while it has some features that defendants' trade dress does not, it has a like number that are similar. The same is true for the other comparable products that have been cited to the court.

Similarly, no secondary meaning has been established. Given the paucity of evidence regarding any intentional copying by defendants, there is certainly no presumption of secondary meaning. In addition, essentially the same analysis of the factors bearing on secondary meaning with respect to the CHEMLOK mark applies to the CHEMLOK trade dress. *See Perini Corp.*, 915 F.2d at 125. In particular, plaintiff has not shown that its trade dress is featured in its advertisements and has not submitted consumer studies linking the CHEMLOK trade dress to plaintiff. Nor has it otherwise shown that its trade dress is sufficiently distinctive to establish a mental association in buyers' minds between the trade dress and plaintiff as the source of the product. The absence of such an association is not surprising in light of the fact that the trade dress is largely functional and similar to that of others. As one court has observed, "[i]t is extremely difficult for a seller to successfully prove that a product or package design has achieved secondary meaning when the design is a common one put on the market by other sellers." *Campbell Sales Group*, 2010 WL 3945350 at *7 (quoting 1 *McCarthy on Trademarks and Unfair Competition* § 8:11.50 (4th ed. 2001)). The acquisition of secondary meaning is also undoubtedly undermined by the fact that plaintiff has changed its trade dress and does not by its own admission use the same trade dress consistently.

The court concludes that there is no genuine dispute as to any material fact regarding the inherent distinctiveness and secondary meaning of plaintiff's trade dress and that the record fails to establish as a matter of law that plaintiff's trade dress is inherently distinctive or has a secondary meaning. The third element of plaintiff's trade dress infringement claim is therefore not satisfied.

**D.      Conclusion on Trade Dress Infringement Claim**

Failure to satisfy any one of the three elements of plaintiff's trade dress infringement claim would be fatal to the claim. Here, the record establishes that none are satisfied. Summary judgment should accordingly be entered dismissing plaintiff's trade dress infringement claim.

**IV.      INAPPLICABILITY OF THE LANHAM ACT**

As their final ground for summary judgment, defendants contend that the purported use and sale of Kemibond solely outside the United States precludes application of the Lanham Act to the facts at issue and that both plaintiff's trademark infringement and trade dress infringement claims, which arise under the Lanham Act, therefore fail. More specifically, defendants contend that the "use in commerce" requirement for trademark and trade dress infringement claims is not met because there is no evidence that the Kemibond products were used or sold anywhere in the United States. *See* 15 U.S.C. §§ 1114(1), 1125(a). Plaintiff counters that Kemibond was previously sold in the United States and that it will be sold in the United States in the future.[13]

Because the court finds that plaintiff's claim fails if the Lanham Act is deemed to apply, the issue of whether or not it does is moot. The court therefore declines to resolve this final ground for defendants' motion.

## CONCLUSION

For the foregoing reasons, the court finds that there is no genuine issue as to any material fact with respect to plaintiff's claims for trademark infringement and trade dress infringement, and defendants are entitled to judgment as a matter of law dismissing these claims. It is therefore

---

[13] The court, of course, previously addressed the issue of United States sales of Kemibond, but in the distinct context of the merits of the infringement claims.

RECOMMENDED that defendants' motion for partial summary judgment (D.E. 346) be ALLOWED and plaintiff's claims for trademark infringement and trade dress infringement be DISMISSED, pursuant to Fed. R. Civ. P. 56(a).

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have until 9 August 2011 to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. Any response to objections are due no later than 10 days from service of the objections or 19 August 2011, whichever is earlier.

Because this Memorandum and Recommendation contains information that may be considered confidential by a party, the Clerk is directed to file it under temporary seal. Any party wishing this Memorandum and Recommendation to remain under permanent seal shall file a motion seeking such relief by 9 August 2011. Any response to such a motion shall be filed by 19 August 2011. In the event no party files a motion to permanently seal this Memorandum and Recommendation by 9 August 2011, the Clerk shall unseal it without further order of the court. In the event a motion to seal is timely filed, this Memorandum and Recommendation shall remain under temporary seal pending ruling on the motion.

SO ORDERED, this 29th day of July 2011.

James E. Gates
United States Magistrate Judge

30